IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEVEN FENNELL, an individual,                    No. 1:22-cv-02003-HZ

               Plaintiff(s),                    OPINION & ORDER

v.

JACKSON COUNTY, a political
subdivision of the State of Oregon;
and DOES 1-10, individual and supervisory
officers of local government,

               Defendant(s).


John Clarke
Katherine Marie Bennett
Miller Nash LLP
1140 S.W. Washington Street
Suite 700
Portland, OR 97205

        Attorneys for Plaintiff

Brett A. Baumann
Johan Pietila
Jackson County Counsel Office
10 South Oakdale, Room 214
Medford, OR 97501

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

This matter is before the Court on Defendants' Motion for Summary Judgment. ECF 33. For the reasons that follow the Court grants Defendants' Motion.

BACKGROUND

Plaintiff, Steven Fennell, identifies as a gay man and "has a history of intermittent incarcerations at the Jackson County Jail" over the last 20 years. Pl. Opp., ECF 37, at 1.

On October 20, 2021, Plaintiff was booked in Jackson County Jail. At 3:15 p.m. on October 21, 2021, Plaintiff submitted a grievance form - known as a "kite" - stating "I need to speak to prea[1] file papers or call . . . I have been sexually harassed and discriminated and am like to speak to someone about it please I have a right to report abuse by inmates and staff of the Jackson county workcenter." Bennett Decl, ECF 38, Ex. 12, at 1. Staff forwarded his kite at 3:46 p.m. that same day. Plaintiff, however, was released from custody less than 48 hours later on October 23, 2021. *Id*., Ex. 2 at 2.

On March 4, 2022, Plaintiff was booked again in Jackson County Jail and placed in the general population. On March 12, 2022, Jackson County Sheriff's Deputy Steven Josephson reported that he was walking through unit 322 for an hourly check and saw Plaintiff "appeared to have swelling and bruising around his left eye." Bennett Decl., Ex. 13 at 4. Josephson asked Plaintiff what happened to his eye and Plaintiff stated, "he had slipped and hit his face." *Id*. at 5. After Plaintiff "repeatedly assured [Josephson] that he had fallen and that no one had assaulted him [Josephson] asked that he be moved to the first floor till medical could evaluate him." *Id*. Josephson removed each adult in custody ("AIC") from cellblock 322 and questioned them separately about the incident, but they each stated they "heard nothing or refus[ed] to talk to"

---

[1] PREA is the Prison Rape Elimination Act, 42 U.S.C. §§ 15602.

Josephson. *Id*. at 5. Plaintiff was evaluated by medical staff and requested to speak to the nurse alone, at which point he told her that he "was assaulted and he believed that his homosexuality had been part of the reason for the assault." *Id.* Plaintiff did not say "anything that would indicate that he was being sexually assaulted" and the nurse stated that she did not "get any information from [Plaintiff] that would lead her to believe that he was sexually assaulted." *Id.* Plaintiff was relocated to new housing on March 12, 2022. *Id.*, Ex. 13 at 1.

On March 13, 2022, Plaintiff was seen by medical who reported "[s]welling to eye has greatly decreased, but dark bruising remains. Vision and breathing are still intact. Mild swelling noted to bridge of nose. . . . Reports his head and face still hurt and he is a little dizzy but has not had any other symptoms." Bennett Decl., Ex. 11 at 5.

On March 23, 2022, at 12:15 p.m., Plaintiff filed a kite asking

> Why haven't I been allowed to press charges on man that broke my nose blackened my eyes and knocked two of my teeth out I'm gay and I still remember him screaming fuck u faggot fuck u faggot wonder why I am having hard time where's prea why aren't I allowed to fill report or grievance I have to fill charges on someone I can't get my teeth back.

Bennett Decl., Ex. 12 at 2. Staff replied that they had forwarded his kite "to the sergeants." *Id.* That same day at 12:20 p.m. Plaintiff filed a kite stating, "I want to know if inmate can call prea when they feel they are being discriminated by facility and inmates I want to immediately if not I'll find out later thank u." *Id.* at 3. It is noted that the kite was forwarded but not to whom. On March 25, 2022, Plaintiff submitted a kite stating, "Why can't I file assault or grievance for getting ass kicked in here by other inmates for being gay?" *Id.* at 5.

Plaintiff was released on April 6, 2022, and his grievances regarding the March 12, 2022, incident were closed.

On August 24, 2022, Plaintiff was again booked into Jackson County Jail. On August 29, 2022, Plaintiff was moved to administrative segregation as a result of an interaction with another inmate. On August 31, 2022, at 2:30 p.m., Plaintiff submitted a "grievance prea complaint" kite stating, "A inmate asked me to suck his dick knowing I'm gay and I refused I believe its the same one who said whatever to put me in hole." Bennett Decl., Ex. 12 at 7. On that same day at 2:34 p.m., Plaintiff submitted a second "prea grievance form" kite in which he stated, "I like to know how I can get grievance papers and if it qualifies as a prea concern if a inmate asked me to suck his dick when I denied he went to staff and made a false claim to put me in hole to hide it thanks." *Id*. at 8. This was forwarded to "shift sergeants and corporals." *Id*. Jackson County Jail PREA coordinator, Sergeant Melissa DiCostanzo, requested Lieutenant Kellen Feyerharm interview Plaintiff regarding his grievances. Feyerharm interviewed Plaintiff and reported on September 1, 2022, that Plaintiff believed he was in administrative segregation "for punishment," but Feyerharm explained that he was "not in trouble," and instead had been moved because of the way "he conducts himself with others including deputies." Bennett Decl., Ex. 8 at 1. At that point Plaintiff "started crying and stated that he is just lonely, thought he was in trouble and knows that he gets loud and animated which can cause people to become uncomfortable." *Id*. Feyerharm asked Plaintiff

> if the request for oral sex was actually made. [Plaintiff] stated he didn't remember if it was here at the jail or outside. [Feyerharm] asked if [Plaintiff] would recognize the person or persons who asked him. [Plaintiff] said probably not. [Feyerharm] informed [Plaintiff] that if he remembers anything else to please ask for a Sgt., and or Cpl., or whoever he feels comfortable talking [to].

*Id*. Feyerharm concluded that at the time of his report he did not "have any substantial information to go forward with in regards to [Plaintiff's] complaint." *Id*.

Between September 11 and 13, 2022, Plaintiff filed several kites complaining about another AIC[2] making loud noise. On September 11, 2022, Plaintiff stated:

> I can't sleep I'm in a cell where somebody is constantly causing loud noises all the time I snapped and started yelling at him to stop cause hours of that every morning and night my heart is hurting bad well after last night I'm now violently ill can that be caused from constant day night loud noise cause if this guy would stop I never had strong heart I feel like he is going to set off a heart attack cause I snapped after I starting yelling shut up embarrassingly and I felt like I had a small heart attack I'm almost 40 can locking a person in a room and summiting them to constant stressful loud noise causing person not to sleep for weeks on end give them health concerns he's stopped for awhile and my chest doesn't hurt and I finally feel I can catch a breath after 15 hours what's your opinion help me please I can't take this its insanity I need some sleep and quiet it physically is hurting me.

Bennett Decl., Ex. 12 at 9. Staff responded that day "we do not provide medication for sleep complaints. You can talk to custody about a housing change. We will refer you to mental health to notify them of the issue." *Id.* On September 12, 2022, at 2:32 p.m. Plaintiff submitted a kite stating, "I'm so sick I can't keep food in diarrhea violently throwing up I hurt a lot it started when the man next to me angel Alvarez he's very loud I couldn't take it after so many days I can't sleep and I started screaming and I want to go to hospital." *Id.* at 10. That same day at 3:54 p.m. Plaintiff submitted a kite stating

> With the pain I can't get food down throat past 3 minutes I can't get food in body anymore my body is stopping it like my digestive systems booked or ruptured it's so painful please I can 't sleep cause angel valdarama is laughing screaming and keeping me up every morning starting from 5 am to 9 am then all night please I just threw up everything its hard to stand up and function I'm not feeling hungary either even though I'm not eating I'm in bad shape I need a hospital I can't sleep make him stop OK make him stop.

---

[2] Plaintiff identifies this individual in various kites filed in September 2022 as Angel Alvarez and Angel Vandarama. Jackson County confirmed the identity of this AIC as Angel Guadarrama on February 22, 2024. Bennett Decl. ¶ 10, Ex. 9

*Id*. at 11. Staff responded at 5:13 p.m. stating Plaintiff had been scheduled for sick call.

On September 13, 2022, at 1:23 p.m. Plaintiff submitted a kite stating:

> I am very sick I can't digest any food I take a few bites and I get
> disabilitating pain across diaphragm instantly for last 5 days I've had
> nothing but liquid and stomach bile coming out I cessed [*sic*] urianating
> [*sic*] three days ago I get no sleep cause angel valderama is no stop
> screaming I don't know what's wrong I can't breath heart hurts so bad I
> can barely stand without labored breathing chronic diarrhea vomiting I
> need help I'm scared please OK I need a doctor.

*Id.* at 12. Staff responded that Plaintiff was scheduled for the next available medical

appointment.

On September 13, 2022, Tracy Brenton was booked into Jackson County Jail and

assigned to share cell 115 with Plaintiff. Sometime before 10:00 p.m., Plaintiff and Brenton were

involved in an altercation. At 11:30 p.m. Deputy Chad Miller completed an incident report

stating that at about 10:00 p.m., he discovered Brenton "standing at his [cell] door with blood on

his face." Bennett Decl., Ex. 13 at 10. Miller could hear Plaintiff "yelling to get [Brenton] out of

my cell . . . [Brenton] tried to touch [Plaintiff]." *Id.* Brenton was escorted to holding. Miller read

Plaintiff his Miranda rights and then related that he was lying on his bunk when Brenton

approached him, attempted to grab Plaintiff's head, asked him if he believed in mind control, and

started chanting "Kali mal." *Id*. Plaintiff pushed Brenton "back and told him to get way from

him" and Brenton "hit his head and face on the wall after he pushed him back." *Id.* Plaintiff

stated that he was not injured and he "was never struck by" Brenton. *Id*. Miller interviewed

Brenton and noted Brenton had "a split front lip and a cut to the top of his head." *Id.* Brenton told

Miller that he took a cookie from Plaintiff and started laughing. Plaintiff told Brenton "to stop

laughing and to get away from him and then . . . punched him one time in the mouth and pushed

him backwards." *Id*. Miller asked Brenton if he had tried to touch Plaintiff or if he believed in

mind control. Brenton responded that he "did reach for [Plaintiff's] head and tried to touch him

but that it wasn't sexual or anything like that." *Id.* When asked what he meant by the mind

control statement, Brenton said he "didn't want to discuss that any further." *Id.* Brenton stated

his head felt fine but his lip hurt and that he wanted to press charges against Plaintiff. Brenton

was moved and Miller sent his report to the District Attorney for review. Deputy Troy Hamilton

also completed an incident report stating that during a routine hourly check Miller found Brenton

"in cell 115 bleeding from a split lip and a laceration on his head." Bennett Decl., Ex. 13 at 6.

Miller interviewed Plaintiff, "who stated Brenton had been grabbing at [Plaintiff's] face and head

stating he was trying to help [Plaintiff] in some way." *Id.* Plaintiff reported that Brenton "kept

doing this and he pushed Brenton off of him resulting in Brenton hitting his head." *Id.* Miller

interviewed Brenton who corroborated Plaintiff's statement that Brenton had been "grabbing at

[Plaintiff's] face to help him with something perceived by Brenton which was not real." *Id.*

Brenton, however, stated that Plaintiff "punched him in the face resulting in [Brenton] falling

backward and hitting his head." *Id.* Hamilton noted "Brenton's injuries are consistent with

[Brenton's] version of events." *Id.*

On September 14, 2022, Plaintiff submitted a kite stating, "may I speak to someone

please" about "mental health." *Id*. at 13. Staff responded that Plaintiff had been referred to

mental health. "There are 300 inmates here and only one mental health person. Please be

patient." *Id.*

On September 27, 2022, at 12:03 p.m. Plaintiff submitted a kite titled "I want my prea

report now" and describing his request as follows:

> Starting in 2004 where I was raped by 3 men and denied right to file prea
> report in working center up to latest instance of sexual harassment and
> attempted forced coercion of oral sex recently by in at on 8 26 2022 and
> three other past instances I want my right to file prea forms now

> immediately I have word my legal team as well as three agencies who
> defend the rights of abused gay lesbian transgender people across america
> have are finally on board the 18 years of abuse by the Jackson county jail
> 5 instance of sexual abuse by inmates and staff can be put to rest I want to
> file prea reports on all immediately or face federal indictment.

Bennett Decl., Ex. 12 at 14. Plaintiffs' grievance was forwarded to unspecified staff. That same

day at 12:27 p.m. Plaintiff submitted a kite stating:

> Everyday angel vandarama whom I want to file grievance or prea
> complaint for the fact that he has been standing in the day room against
> the window masterbating and ejaculating on glass he waits till sound of
> door clicks signalling [*sic*] guards gone checks both then even voiced has
> been outloudsaying [*sic*] obscene sexual and derogatory terms about my
> being gay like I all fuck that ass faggot as he ejaculates slowly to
> aggressively in day room in loud voice I be had to clean his semen pubic
> hair and bodily fluids everyday without no compensating not even a sack
> lunch in Lew [*sic*] of a direct keep away I have on him on file I want to
> file prea on staff and him immediately.

*Id.* at 16. Plaintiff was directed to speak to a deputy. Also on September 27, 2022, at 12:46 p.m.

Plaintiff submitted a kite stating

> I'm tired of this its crazy I can't ignore somebody yelling at me for being a
> faggot and making loud sexual explicit noises every time I'm in day room
> I'm going in my room you all are out of your minds I can't make calls to
> my defense team or to acquire money for bail or set up my settlement
> these disruptions have caused me major distress now I'm forced by this
> facilities treatment to go to prison because of your lack of providing even
> me they few things a prisoner is entitled to by law in all detention facilities
> in america I'm celling in and I can't take this abuse from constant sexual
> harassment by inmates and deputies threats to my rights and physically
> well being its abuse.

*Id*. at 17. Plaintiff's kite was forwarded to an unspecified sergeant.

On October 18, 2022, the Oregon Governor's office received a letter from Plaintiff in

which he stated in pertinent part that

> [o]ver a period of 18 years . . . I have been victim to multiple instances of
> sexual abuse, harassment, and discrimination from inmates and staff based
> on sexual orientation and sometimes not. . . . [E]very instance whether I'm
> right or wrong over 5 separate occasions spanning 18 years . . . I have tried

> to file prea complaint to charges with staff or inquire about doing so and I
> have been denied everytime. . . . I don't believe as well that they even
> have an operating prea option on any phone in Jackson County Jail or any
> way to file complaints ever to this day.

Bennett Decl., Ex. 10 at 3-4. Plaintiff's complaint was forwarded to Sherriff Nathan Sickler "to

provide [him] with a PREA notification." *Id*. at 1. At deposition Captain Joshua Aldrich, jail

commander for Jackson County Jail, testified that Plaintiff's letter was "preserved . . . as

documentation," but no other action as taken because the letter did not contain information about

"specific incidents that we had not previously looked into related to the jail." Bennett Decl., Ex.

3 at 15-16.

On December 29, 2022, Plaintiff filed a *pro se* Complaint against Jackson County in this

Court pursuant to 42 U.S.C. § 1983 in which he alleged he was "denied right to file Prea lack of

filing system to allow me to file." Compl., ECF 1, at 3. In response to the Statement of Claim

section requesting the "date and approximate time" of the "events giving rise to [his] claim"

Plaintiff stated, "multiple events between 2019 and 2022." *Id*. at 5.

Plaintiff was appointed counsel and on June 23, 2023 he filed an Amended Complaint

against Jackson County and Does 1-10 and asserting (1) a claim against the County pursuant to

*Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), for failure to

protect under the Fourteenth Amendment and (2) and claim against the Doe defendants pursuant

to the Fourteenth Amendment for failure to protect. Plaintiff seeks compensatory and punitive

damages.

On March 15, 2024, Defendants filed a Motion for Summary Judgment as to both of

Plaintiff's claims. The Court took the Motion under advisement on April 26, 2024.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I.    Claim Against Doe Defendants

Plaintiff brings his second claim against the Doe defendants pursuant to the Fourteenth

Amendment for failure to protect. Plaintiff alleges Doe defendants were "aware that [Plaintiff]

was particularly vulnerable to sexual assault and harassment from other inmates," aware "of the

substantial risk of serious harm created by continuously ignoring [Plaintiff's] Kite requests to file

a PREA claim and for further protection from continued sexual harassment and abuse," and

"disregarded these known risks of serious harm to [Plaintiff] and took no action to protect

Fennell from harm." FAC ¶¶ 35-37. Plaintiff, however, failed to identify the Doe defendants or

to amend his Complaint to substitute the relevant individuals for Doe defendants. Defendants

assert in their Motion for Summary Judgment that summary judgment is proper as to Plaintiff's

claim against the Doe defendants under these circumstances. Plaintiff does not respond to

Defendants' assertion that summary judgment is proper as to Plaintiff's claim against the Doe

defendants, provides no argument or authority indicating that summary judgment is

inappropriate, and appears to concede he has not and cannot identify the Doe defendants.

"As a general rule, the use of 'John Doe' to identify a defendant is not favored." *Gillespie

v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)(citation omitted). "However, situations arise . . .

whe[n] the identity of alleged defendants will not be known prior to the filing of a complaint."

*Id*. "In such circumstances, the plaintiff should be given an opportunity through discovery to

identify the unknown defendants[.]" *Id*. (citation omitted). This Court and other district courts in

the Ninth Circuit have consistently held that the opportunity to name Doe defendants ends with

the close of discovery. *See, e.g.*, *Bratcher v. Polk Cnty.*, No. 3:20-CV-02056-SB, 2022 WL

17184419, at *5 (D. Or. Sept. 1, 2022), report and recommendation adopted, No. 3:20-CV-2056-

SB, 2022 WL 17178266 (D. Or. Nov. 23, 2022)(granting summary judgment as to claims brought again Doe defendants when they had not been identified or substituted at the end of discovery); *Ouma v. Clackamas Cnty*., No. 3:12-cv-01465-HZ, 2014 WL 1874051, at *2 (D. Or. May 7, 2014)(dismissing claims against the Doe defendants when the plaintiff had "over a year since the filing of the case" to identify the Doe defendants but had not done so and finding that the "use of John Doe is disfavored, but allowed through the end of discovery"); *Entsminger v. Aranas*, No. 316CV00555MMDWGC, 2021 WL 4394773, at *3 (D. Nev. Sept. 24, 2021) ("Because discovery has now closed and [the plaintiff] cannot provide the Doe Defendants' names, the Court finds that they should be dismissed without prejudice.").

The Court grants Defendants' Motion for Summary Judgment as to Plaintiff's second claim for violation of the Fourteenth Amendment by Doe defendants.

## II.    *Monell* Claim

Plaintiff brings his first claim against Jackson County pursuant to *Monell* and alleging Jackson County "has a policy, practice, and custom to address the Fourteenth Amendment violations set forth in this complaint." FAC ¶ 25. Plaintiff alleges Jackson County was "aware that [Plaintiff] was particularly vulnerable to sexual assault and harassment from other inmates," aware "of the substantial risk of serious harm created by continuously ignoring [Plaintiff's] Kite requests to file a PREA claim and for further protection from continued sexual harassment and abuse," and "disregarded these known risks of serious harm to [Plaintiff] and took no action to protect [Plaintiff] from harm." *Id*. ¶¶ 26-28. "Because of this notice and because of the widespread nature of the violations and the resulting harm, [Jackson County] knew or should have known of the need to train and supervise those under its control to prevent the violations, but its [*sic*] repeatedly failed to provide such training or supervision." *Id*. ¶ 27.

In his opposition to summary judgment Plaintiff asserts Jackson County failed to "appropriately train its staff on the proper policies and procedures to (1) screen for an AIC's vulnerability to sexual harassment and abuse based on their sexual orientation; and (2) properly respond to an AIC's reports of sexual harassment and abuse." Pl. Opp. at 7. Defendants assert jail staff all received PREA training, Plaintiff fails to identify what further training was necessary, and Plaintiff does not establish that the failure to train was the but-for cause of any injury.

### A.    Standards

Section 1983 liability of a local governing body arises only when "action pursuant to official . . . policy of some nature caused a constitutional tort" and not on the basis of *respondeat superior*. *Monell*, 436 U.S. at 691-94. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)(emphasis in original). The circumstances in which *Monell* liability may be found under § 1983 are "carefully circumscribed." *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To establish a claim for *Monell* liability caused by a government policy or longstanding practice or custom, A plaintiff must prove (1) he was deprived of a constitutional right; (2) the municipality had a policy, longstanding practice, or custom; (3) the policy, practice, or custom amounted to "deliberate indifference to the plaintiff's constitutional right"; and (4) the policy, practice, or custom was "the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

The Ninth Circuit also recognizes that a local government body can be held liable for "[a] policy of inaction or omission[, which is] based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)(citation omitted). *See also Sabra*, 44 F.4th at 884. "To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, 'that this policy amounts to deliberate indifference to the plaintiff's constitutional right[,]'" *Id.* at 1474 (citation and quotation omitted), and "that the policy caused the violation, in the sense that the [municipality] could have prevented the violation with an appropriate policy." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 387–89 (1989)). A plaintiff who alleges a policy of inaction must establish that such a policy amounts to deliberate indifference to the plaintiff's constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997) "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quotation omitted). "Deliberate indifference exists when the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Park*, 952 F.3d at 1141 (quotation omitted). Objective deliberate indifference "requires a showing that the facts available to the County put it on actual or constructive notice that its practices . . . were substantially certain to result in the violation of the constitutional rights of its citizens." *Sandoval v. County of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021)(quotation omitted). Deliberate indifference ordinarily is shown through "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Park*, 952 F.3d at 1142.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985)(plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* ")). A "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton*, 489 U.S. at 388). "Only then 'can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.'" *Id.* (quoting *Canton*, 489 U.S. at 389). Although "[i]n *Canton*, the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference, *Connick*, 563 U.S. at 63, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quoting *Bryan Cty.*, 520 U.S. at 409). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action - the 'deliberate indifference' - necessary to trigger municipal liability." *Id.* (quotation omitted).

"The Supreme Court has explained that these heightened requirements for establishing responsibility for a policy of omission are necessary to avoid imposing respondeat superior liability, which would run afoul of *Monell*." *Tsao*, 698 F.3d at 1143 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)). "After all, when a municipal employee

commits a constitutional tort, it could always be alleged that the municipality failed to enact a policy that would have prevented the tort. Without the rigorous state of mind requirements set out in *Canton* and subsequent cases, there would be nothing left of *Monell's* rule against respondeat superior liability." *Id.* at 1143-44 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Bd. of Cnty. Comm'rs*, 520 U.S. at 406–07)). "*Canton's* standards thus ensure that, even if the alleged defect in the municipality's policy is one of omission, the acts of constitutional tortfeasors can still 'fairly be said to be those of the municipality.'" *Tsao*, 698 F.3d at 1144 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 404).

**B.    Analysis**

Plaintiff asserts jail staff are not adequately trained to evaluate an AIC's vulnerability to sexual abuse and harassment based on their sexual orientation at booking. Plaintiff points out that Jackson County developed a policy to screen transgender individuals at booking because they are at higher risk of sexual abuse and harassment, but the same level of screening is not applied to inmates who identify as homosexual "despite the evidence that they face similar risks." Pl. Opp. at 8. Plaintiff asserts this failure to train amounts to deliberate indifference to the rights of AICs.

Under a failure-to-train theory, a plaintiff must allege "sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021)(citing *Canton*, 489 U.S. at 388-89)).

Defendants contend the record not support Plaintiff's assertion that homosexuals face the same high level of risk as transgender individuals such that screening for sexual orientation should be as strict as that for transgender. Plaintiff relies on testimony by DiCostanzo at deposition that an individual who identifies as a "gay man" might be "at higher safety risk" going into the general population at Jackson County Jail. DiCostanzo, however, then stated that risk was because "they have different wants and needs as opposed to people in the population." Bennett Decl., Ex. 5 at 8. Whether such an individual was at higher risk of assault "depends on the individual I think. . . . Depends who the person is. . . . Every situation is different." *Id*. at 8-9. Similarly, Corporal Jeff Lemke of the criminal investigation division of the Jackson County Sheriff's Department testified that given his experience he did not believe that inmates "are at a high risk of abuse or harassment if they identif[y] . . . as being . . . gay." Bennett Decl., Ex. 6 at 2. Captain Aldrich testified "people who are homosexual are not necessarily more at risk being in our jail than those who aren't. It's fairly frequent that there's people who have different sexuality identification within our facility." Bennett Decl., Ex. 3 at 10. In contrast Aldrich testified that the County screens AIC's on intake for transgender identification because they are at a higher safety risk. Aldrich stated, "we definitely experienced transgender individuals who are probably at a higher risk for safety." *Id*. at 12. Plaintiff fails to point to any evidence that any failure to train jail staff to screen individuals for their sexual orientation was "so likely to result in [a] violation of constitutional rights, that the policymakers . . . reasonably [could] be said to have been deliberately indifferent to the need." *Park*, 952 F.3d at 1141.

Plaintiff also asserts Defendant's alleged failure to train staff to properly respond to an AIC's reports of sexual harassment and abuse amounted to deliberate indifference. The record, however, reflects all jail employees received PREA training on how to respond to reports

of sexual abuse. *See, e.g.,* Bennett Decl., Ex. 4 (Feyerharm Depo.) at 2-3 (testifying all jail

employees take three classes of PREA training); Bennett Decl., (DiCostanzo Depo.), at 3

(testifying "all trainees when they get hired" take PREA training that includes "how to conduct

interviews, what to look for, how to separate, things like that"). Plaintiff does not establish what

more or different training was lacking that amounted to deliberate indifference or how further

training would have prevented injury to Plaintiff.

        To the extent that Plaintiff relies on the events of October 2021, March 2022,

August 2022, and September 2022 to support his claim, these incidents do not establish that

Plaintiff suffered a constitutional injury that would not have resulted if jail staff had been

"properly" trained in how to respond to reports of sexual harassment or that the alleged failure to

train was the "but-for" cause of harm. Plaintiff's October 2021 kite did not identify the

individual or individuals that he alleged assaulted and/or harassed him or the nature of the

harassment or harm. In addition, Plaintiff was released from custody less than 48 hours after he

submitted the kite, which did not provide jail staff with sufficient time to investigate Plaintiff's

kite on the limited allegations available. Plaintiff's March 2022 event was investigated by

Deputy Josephson. Plaintiff told Josephson that he had slipped and had not been assaulted.

Josephson also separately questioned every AIC in the cellblock and was told they heard nothing

or would not speak with him. Plaintiff also did not provide Josephson or medical staff with any

information about the individual who allegedly assaulted him nor did he include information

about that individual in his March 23, 2022 kite. Plaintiff's August 2022 kites and complaints

were also investigated. When Feyerharm interviewed Plaintiff and asked, "if the request for oral

sex was actually made," Plaintiff responded that "he didn't remember if it was here at the jail or

outside." Feyerharm asked if Plaintiff would recognize individual or individuals who asked him

for oral sex and Plaintiff said probably not. Ultimately Feyerharm concluded that he did not

"have any substantial information to go forward with in regards to [Plaintiff's] complaint."[3]

Similarly, jail staff investigated the September 13, 2022 altercation, separated Plaintiff and

Brenton, and moved them to separate housing. Plaintiff does not point to any evidence that

indicates jail staff had any reason to believe Plaintiff was at risk from the individuals who

allegedly assaulted him in October 2021 and March 2022 or at risk from Brenton nor was it

established that Plaintiff was asked for oral sex in March 2022. Plaintiff does not establish that

these events would not have occurred if jail staff had received more or different training.

      With respect to Plaintiff's September 2022 kites regarding feeling ill and a request

to see someone about mental health, the record reflects staff promptly referred Plaintiff to

medical and to mental health. In addition, those kites did not relate to sexual harassment or

assault, but rather indicated an individual variously identified as Angel Alvarez and Angel

Valderama was making loud noise that was making Plaintiff feel ill. On this record, the Court

concludes Plaintiff has not established that a material dispute of fact exists as to whether the

alleged failure to train staff to screen for sexual orientation or how to respond to allegations of

abuse or harassment was the but-for cause of any constitutional injury to Plaintiff. Plaintiff fails

to satisfy the "rigorous causation standard" for *Monell* claims regarding failure to train.

      Finally, Plaintiff asserts Jackson County adopted a long-standing jail-wide custom

of ignoring the abuse and harassment suffered by Plaintiff. "Establishing municipal liability

through the existence of a longstanding practice or custom is predicated 'on the theory that the

---

[3] In addition, the Ninth Circuit has held even after PREA that verbal harassment alone is generally insufficient to establish a violation of the Fourteenth Amendment. *See, e.g., Lund v. Cal.*, No. C20-7133, 2021 WL 4958985, at *2 (9th Cir. Oct. 26, 2021)(affirming the dismissal of a prisoner's Fourteenth Amendment claim because "verbal harassment generally is not sufficient to state a constitutional deprivation").

19 – OPINION & ORDER

relevant practice is so widespread as to have the force of law.'" *Sabra v. Maricopa Cnty. Cmty. Coll. Di*st., 44 F.4th 867, 884 (9th Cir. 2022)(quoting *Bd. of Comm'rs v. Brown,* 520 U.S. 397, 404 (1997). A plaintiff "cannot allege a widespread practice or custom based on 'isolated or sporadic incidents; [liability] must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiff's allegations and evidence relate only to a single inmate: himself and involves four incidents, three of which were investigated by jail staff. Plaintiff fails to establish that a material dispute of fact exists that Jackson County had a "permanent and well settled" municipal policy to ignore harassment and abuse suffered by Plaintiff.

The Court, therefore, grants Defendants' Motion for Summary Judgment as to Plaintiff's first claim.

## CONCLUSION

The Court GRANTS Defendants' Motion for Summary Judgment, ECF 33.

IT IS SO ORDERED.

DATED:____May 17, 2024_____.


_____
MARCO A. HERNÁNDEZ
United States District Judge